# JACKSONVILLE, LOUISVILLE & ST. LOUIS RAILWAY COMPANY
## v.
## LOUISVILLE & NASHVILLE RAILROAD COMPANY.

*Railroads—Rent of Track, Depot and Terminal Facilities—Successor of Lessee.*

1. The words "terminal facilities," as understood by those operating railroads, do not include tracks other than those used in making up trains.

2. In the case presented, this court holds that a track named, was not a part of plaintiff's terminal facilities, and that switching cars over it to and from certain car shops, was a service separate and distinct from those services mentioned or included in the contract sued on, and that the plaintiff is entitled to recover the amount such separate service was reasonably worth.

3. This court likewise holds that the evidence in the case presented warranted the jury in finding that defendant road was the successor of the original lessee, and operated its trains over plaintiff's track, had the benefit of plaintiff's franchise, and the use of its depots and terminal facilities, and was furnished by plaintiff with labor, materials and supplies, in the same manner its predecessor had been supplied, and that plaintiff was entitled to recover therefor; and further, that under the common counts the plaintiff was not bound to prove a special contract,

in order to recover a reasonable price for the use and occupation of its property.

4. This court holds also that if plaintiff and defendant recognized and acted under the contract in question as a valid and binding contract between them, during the time defendant used and occupied plaintiff's property, no formal assignment of the same was necessary to a recovery under it by the plaintiff for a breach of its conditions.

5. An instruction which has no application to the facts proven, should be refused; likewise one that is misleading and not based upon the evidence; likewise one that is superfluous, instructions given, containing matter included therein.

[Opinion filed June 26, 1893.]

APPEAL from the Circuit Court of Jefferson County; the Hon. E. D. YOUNGBLOOD, Judge, presiding.

Messrs. ISAAC L. MORRISON and C. H. PATTON, for appellant.

Mr. J. M. HAMILL, for appellee.

MR. JUSTICE GREEN. This was a suit in assumpsit by appellee against the appellant, brought to recover rent of track, rent of depots and terminal facilities at Mt. Vernon, Illinois, supplies, materials and labor, and for switching cars by appellee for appellant to and from the shops of a company in Mt. Vernon engaged in the business of manufacturing and selling railroad cars.

The declaration contains seven counts, six common counts and one special count, on the following contract:

" This agreement made this 15th day of April, A. D. 1888, by and between the Louisville & Nashville Railroad Company, a corporation organized and existing under the laws of the State of Kentucky, as lessee of the Southeast & St. Louis Railway, party of the first part, and the Jacksonville Southeastern Railway Company, and as owner of the Louisville & St. Louis Railway, its successors and assigns, a corporation organized and existing under the laws of the State of Illinois, witnesseth:

That, whereas, the party of the second part has constructed and is operating a line of railway from Jacksonville, Illinois, to Driver's Station in Jefferson County, Illinois, which is the present terminus of said party of the second part, and is situated on the line of the Southeast & St. Louis Railway, about five miles west of Mt. Vernon, Illinois, for the joint use and maintenance of which station an agreement has been entered into between the parties of the first and second part and dated the 12th day of May, 1888.

And, whereas, the party of the second part is desirous of securing traffic rights over the line of the party of the first part between said Driver's Station and Mt. Vernon, Illinois, together with terminal facilities in said city of Mt. Vernon, it is hereby agreed, as follows:

1. That for and in consideration of the annual rent of five hundred dollars ($500) per mile, payable semi-annually, to be paid by said party of the second part to said party of the first part, said party of the first part hereby demises, rents and leases to said party of the second part, the joint use of its track between said Driver's Station and said Mt. Vernon Station, including the right to make connection with the Louisville, Evansville & St. Louis Railroad Company, at Mt. Vernon, the distance between said stations, for the purpose of this agreement, being estimated at five miles; the parties hereto to have equal traffic rights upon said track between said stations, the trains of both parties of the same class to have the same rights, and where the time of trains of the same class conflicts, an equitable division of differences shall be made; the term of this lease to continue from the 15th day of April, 1888, to the 15th day of April, 1893, and thereafter, until abrogated by written notice, as hereinafter provided. Should either party desire to abrogate the foregoing provisions, it shall give to the other party one year's written notice of its intention so to do. Should it be desired to abrogate this lease at the expiration of the five years, notice shall be given at the end of the fourth year, by the party desiring to abrogate said lease,

the intention of the parties hereto being that the foregoing provisions of this lease shall not terminate under any circumstances except upon one year's written notice.

2.    Should any damages result to persons or property at or between the stations above mentioned, from any act or negligence of the party of the second part, its officers, agents, servants or employes, while using the track and other facilities described in the first section hereof, said party of the second part agrees to hold said party of the first part entirely harmless against all such damages.    And should said party of the first part be sued and judgment rendered against it for such damages, said party of the second part binds itself, its successors and assigns, to pay all of said damages, with all the costs and expenses incident thereto; or if said party of the first part should pay said damages, judgments, costs or expenses, said party of the second part agrees to refund the same to said party of the first part.    Should any damages to persons or property result from any negligence or act of said party of the first part, its officers, agents, servants or employes, at or between said stations, said party of the first part agrees in like manner to hold said party of the second part harmless against all such damages.

3.    Said party of the first part agrees to admit said party of the second part to the joint use of its facilities for conducting passenger and freight traffic, at Mt. Vernon, Illinois.    The station agent at Mt. Vernon station and the employes under him engaged in conducting the passenger and freight traffic shall be the joint employes of the two parties hereto.    Such agents and employes shall be selected and appointed by said party of the first part, subject to the approval of the said party of the second part.    For the joint use of the depot facilities at Mt. Vernon, Illinois, the party of the second part shall pay to the party of the first part a reasonable rent, which shall be fixed from time to time by agreement between the superintendents or general managers of the parties hereto, and it is agreed that the expenses incurred in the conducting of said traffic at each station shall be divided between the parties hereto, as

follows: The proper portion of the agent's salary, which would be chargeable to passenger business, together with the salaries of such clerks as are engaged solely on passenger business, and the expenses of maintaining passenger waiting rooms, heating and lighting the same, etc., shall be divided in the proportion that the number of tickets sold for each party bears to the total number of tickets sold at said station for both parties, and the remainder of the agent's salary, and the salaries of the freight clerks and other employes engaged solely in freight business, together with the expenses of maintaining and operating the joint freight depot, and the wages of the enginemen and firemen on the switch engines at said station, shall be divided in the proportion that the number of tons of freight handled for each party at said station bears to the total number of tons of freight handled for both parties; provided, that in the computation of such freight business, the tonnage interchanges coming from one road and going to the other, shall be counted to each road. But the party of the second part shall not be required to pay any portion of the expenses of maintaining tracks at said station, or for any repairs to, or maintenance of the said switch engines at said station.

4. The said party of the first part will furnish to said party of the second part such round-house room as it can spare, without charge; and for the following services, said party of the second part agrees to pay to said party of the first part the following amounts set opposite each item:

Wiping one engine........................$1 10
Turning one engine.........................   15
Tank of water..............................   25
Firing up engine (including wood)..........   50
Washing boiler............................. 1 00
One extra tank of water for washing out
    boiler .................................   25
Each box of sand...........................   40

The enginemen of said party of the second part to deliver and receive their engine at the round-house of said party of

the first part. If said party of the second part should desire any inspection of its engines or cars, or ordinary running repairs made on the same, the party of the first part will make such repairs on the written order of such employe of the party of the second part as may be designated in writing by the superintendent or manager of said party of the second part, and will charge actual cost of the same with ten per cent added; all of which charges, with ten per cent added, said party of the second part hereby agrees to pay.

5. Said party of the second part agrees to pay to said party of the first part, monthly, all the bills rendered by said party of the first part to said party of the second part, for all charges made by said party of the first part against said party of the second part under the third and fourth sections of this agreement.

6. The agent or other bonded employes at said Mt. Vernon station, shall be regarded as the agent or employes of said party of the second part as well as the agent or employes of said party of the first part. And such agents or employes shall be directly and severally liable to each of the parties hereto, for the respective business transacted by each party; and such agent or employes shall pay over all moneys received by him or them to each of the parties hereto for the respective business transacted by each according to the terms of this agreement. When the inspector of agencies or traveling auditor of either party hereto is sent to check the accounts of said agent or other employes, timely notice shall be given to the opposite party's accounting department, so that both parties may be represented and the condition of each party's account with said agent or other employes may be definitely and simultaneously ascertained and determined.

7. The third section, and all sections following it, of this agreement, may be abrogated by either party hereto, upon ninety days' written notice, given by the party desiring to abrogate said sections, to the opposite party. In testimony whereof the parties hereto have caused these presents to be duly executed by the proper authorized officers, and their

corporate seals to be hereunto affixed, this twelfth (12th) day of May, 1888."

Defendant pleaded the general issue, a trial was had by jury and a verdict for plaintiff was returned for $5,972.88 damages.

Defendant's motion for a new trial was denied, and judgment for plaintiff was rendered for the above amount and costs of suit. The record is brought up on appeal by the defendant, and this court is asked to reverse the judgment.

The amount recovered is made up of $1,250 for rent of the five miles of appellee's track between Driver's and Mt. Vernon from December 1, 1890, to May 31, 1891; $3,069.67 rent of depots and terminal facilities at Mt. Vernon, and supplies, materials and labor furnished by appellee from October 4, 1890, to May 31, 1891; and $1,653.21 for switching cars, by appellant, to and from the Mt. Vernon car shops, from October 4, 1890, to November 10, 1891. The evidence shows that appellee furnished the trackage, depots, terminal facilities, supplies, materials and labor, during the periods respectively above mentioned, that the prices charged and so allowed by the jury were correct and in accordance with the terms of the foregoing contract, and that the respective amounts so allowed were due and unpaid to appellant when this suit was commenced.

The evidence also shows that from October 4, 1890, to November 10, 1891, appellee switched to and from said car shops 1102 loaded cars, for which it charged two dollars per car, and during the same period switched in like manner 330 empty cars, for which it charged fifty cents per car. It was proved and not denied, that the prices so charged for switching were reasonable. The aggregate amount charged therefor was $2,369, but a credit on this of $715.79 was allowed, because the switching of some of these cars, amounting to the latter sum, was improperly included in the tonnage charge, and the credit was properly given to prevent a double charge for the same service, thus leaving $1,653.21, which was the amount allowed. It is contended on behalf of appellant that this balance due as a switching charge

had been paid, but an examination of the evidence in the record satisfies us it had not been paid either in whole or in part. Appellant, as we understand it, further insists that the terminal facilities at Mt. Vernon included the track to Mt. Vernon car works, and the switching of cars to and from the shops could not be charged for, under the contract, as a separate and distinct item at so much per car, but the expense of such service must be estimated upon the tonnage basis as provided in said contract. Our construction of the contract does not admit this interpretation. We must give it the meaning understood and intended by the parties at the time of its execution. Terminal facilities as understood by those operating railroads do not include tracks other than those used in making up trains, and the track put in upon the property of said Car Works Co., was not used for that purpose, did not belong to appellee, and was not a part of its terminal facilities, as appears by the testimony of Dickson, division superintendent of appellee, a witness qualified by his experience and knowledge of such matters to testify what the railroad men understood terminal facilities meant, and we presume those words were employed by the parties to the contract, to be interpreted in accordance with such general understanding by railroad men. Moreover, at the time said contract was executed the car works shops and track had not been built, nor, so far as appears by the evidence, was the building thereof then contemplated. We hold that said car works track was not a part of appellee's terminal facilities, and switching cars over it to and from the shops was a service separate and distinct from those services mentioned or included in the contract, and that appellee is entitled to recover the amount such separate service was reasonably worth.

It is further insisted on behalf of appellant that even if the trackage, depots, terminal facilities, supplies, etc., were furnished as claimed under the contract, and cars were switched to and from said car works shops, as claimed, and appellee could maintain a suit therefor, yet appellant was not liable, but the Louisville and St. Louis Railway Com-

pany would be, because it was the successor of the Jacksonville Southeastern Railway Company, and because appellant never owned or operated any railroad until February 1, 1891, but the Louisville and St. Louis Railway Company built the road from Centralia to Driver's, and in the summer of 1888, absorbed the Jacksonville Southeastern Railway and became its successor, and thereafter operated the two roads from Jacksonville to Mt. Vernon, and because appellant had no contract with appellee, and never ran a train over its road. It will be seen by referring to the contract between the appellant and the Jacksonville Southeastern Railway Company, dated May 12, 1888, that the latter party agreed on behalf of itself and its successors and assigns to comply with the terms thereof by it to be performed, among other things to pay the rents reserved and other charges for the term of five years, beginning April 15, 1888, and ending April 15, 1893, and thereafter until abrogated by one year's written notice, given by the party desiring to terminate said contract.

We have held in the case of St. Louis and Cairo Railroad Company v. East St. Louis and Carondelet Railway Company, 39 Ill. App. 354, affirmed by the Supreme Court, see 139 Ill. 401, that the right to operate trains of one company over the railroad track of another, necessarily includes the right to use the franchise of the latter, and such right could be lawfully leased by the owner of the railroad track to another corporation. And we also in the case cited hold, that if, after a railway company has given a deed of trust upon its property and franchise, it leases from another company the right to use its track, and afterward the deed of trust is foreclosed and the property and franchise is sold under the decree in foreclosure, to a third company, which continues to use the leased track in the same manner the lessee had done, such purchaser so using the track is liable to pay the rent agreed to be paid by the lessee to lessor as provided in the contract, and is bound by the terms thereof. In the case at bar, if the record discloses the facts to be, that the appellant was the successor of the Jacksonville

Southeastern Railway Company, and used the track, depots and terminal facilities of appellee, and was furnished by it and used labor, materials and supplies as charged, then appellant was liable to pay for the same in accordance with the terms of the contract and was bound thereby the same as though it had executed the contract originally.

We are satisfied the evidence warranted the jury in finding that appellant was the successor of the original lessee and operated its trains over appellee's track, had the benefit of appellee's franchise, and the use of its depots and terminal facilities, and was furnished by appellee with labor, materials and supplies, in the same manner its predecessor had been; that the switching service charged as a separate item was performed by appellee for appellant, and the latter was liable therefor. Appellant was incorporated January, 1890, and the purpose, as shown by the articles of incorporation, was to lease or purchase, own and operate a railway through the several named counties to Centralia. On July 1, 1882, the Jacksonville Southeastern Railway Co., then owning the railway completed from Jacksonville to Litchfield, and desiring to extend it to Centralia, gave it a trust deed, executed by its president, William S. Hook, to secure the payment of money loaned for the purpose of building such extension. The debt so secured was evidenced by the bonds of the company and was, by the terms of the deed, made a lien on the railway from Jacksonville to Centralia and on all the corporate property and franchises then owned or that were thereafter acquired by the company.

This deed of trust was foreclosed at the February term, 1890, of the Marion Circuit Court, and by virtue of the decree entered in that proceeding the master in chancery sold all the mortgaged property to a committee representing the mortgage creditors who paid the full amount of their bid, except $11,205 paid in cash, in the bonds secured by the trust deed, and received the master's deed for the property sold October 4, 1890. On January 3, 1891, this committee, in consideration of the payment to them of $1,187,200, in the first consolidated mortgage bonds of the

appellant, conveyed all of said property to William Elliott, and he, on the same day, deeded all of said property to the appellant in consideration of $1,180,200 paid in said first consolidated mortgage bonds, and $1,500,000 paid in the capital stock of appellant, and it became the owner of all the railway from Jacksonville to Centralia, and all the prop-erty and franchises the Jacksonville Southeastern Railway Co. had formerly owned.    This last named company ceased to exist on October 4, 1890, by reason of the sale then made of all its property, and we think the evidence in the record (which is not fully set forth in the abstract) justified the jury in finding that appellant became its successor on that date, and operated freight and passenger trains over the entire line from Jacksonville and Springfield to Mt. Vernon, during all the period within which the indebtedness sued for had accrued.    The circumstances attending the master's sale, the character of the payments made to him, the subsequent conveyances by the bidders to Elliott, and by him to appellant, both made on the same day, the fact that the mortgage bonds of appellant formed the entire consideration for the conveyance to Elliott, and a large part of the consideration for the conveyance to appellant, and the further fact that William S. Hook was the president of the Jacksonville Southeastern Railway Co., and one of the incorporators of appellant company, incorporated January 18, 1890, one month before the said foreclosure proceedings were commenced, for the expressed purpose of purchasing the railway property and franchises sold by the master, all indicate that the purchase was made at the sale for appellant, in pursuance of a previous arrangement to accept its mortgage bonds in payment of the debt secured by the deed of trust, and permit appellant from the day of sale to enter into the possession of and operate its trains over the railway that was sold.    Furthermore, there was evidence tending to prove that William S. Hook was the president of appellant, and notwithstanding he denied that fact, yet if the jury believed the witnesses for appellee they could properly find he was such president, and it is admitted

Marcus Hook was the auditor of appellant. It also appears that the summons in this case was served on Lutz as agent of appellant, and it is not denied he was its agent at Mt. Vernon.

In addition to the evidence already mentioned, the evidence of Lutz and Dickson, the depositions of Knott and Seawell and the letters of Marcus Hook, as auditor, attached as exhibits thereto. The statements of William S. Hook and his official correspondence as president, and that of Marcus Hook as auditor of appellant, with the officers of appellee, warranted the finding that from and after October 4, 1890, and during the entire period within which the indebtedness sued for accrued, appellant was the successor of the lessee in the contract of April 15, 1888, claiming the same rights said lessee acquired thereby, and as such successor, recognizing the said contract as existing and binding upon it, used the track and franchise of appellee between Driver's and Mt. Vernon, and its depots and terminal facilities there, and the labor, materials and supplies furnished by appellee as charged, in operating its train and carrying on its railway business, and that the switching service before mentioned was performed by appellee for the appellant as claimed. The amount recovered, comprising the several items as set out in this opinion, was due and owing to appellee, and the jury rightfully found appellant liable therefor. We find no reversible error in the ruling of the court in admitting or refusing to admit evidence. The claim by appellant that the Louisville & St. Louis Railway Co. was the successor of the lessee in said contract, and operated the trains over appellee's track and used the terminal facilities, labor, supplies and materials furnished by appellee, is not supported by the evidence. The Louisville & St. Louis Railway Co. owned no engines, cars, or equipment, and operated no trains. The first instruction given for plaintiff is as follows:

" No. 1. If the jury believe from the evidence that the defendant is the successor of the Jacksonville Southeastern Railway Company, and as such successor came into the pos-

session of the property, rights and franchises of the Jacksonville Southeastern Railway Company, and that the defendant since it first came into possession of the railway formerly owned by the Jacksonville Southeastern Company, had been operating such railway, and running its trains over the railroad of the plaintiff, between Driver's Station and Mt. Vernon, and between Mt. Vernon and Driver's Station, and using the terminal facilities of the plaintiff for freight and passenger business, at Mt. Vernon, and has been furnished with supplies and materials, labor and services, about the transaction of its business, by the plaintiff, while it was operating its trains over plaintiff's road, between the places above mentioned, and defendant has claimed the right under contract of April 15, 1888, between the plaintiff and the Jacksonville Southeastern Railway Company, to operate its trains over plaintiff's railroad, between the places above mentioned, and to use plaintiff's terminal facilities at Mt. Vernon for the transaction of its freight and passenger business, then the defendant is liable to the plaintiff for whatever sum you find from the evidence to be due, under the contract of April 15, 1888, for rent of track, terminal facilities, supplies and materials, labor and services furnished, if any, by the plaintiff, from the time defendant first commenced to operate and run its trains over plaintiff's railroad, until May 31, 1891.

Appellant complains of this instruction, and insists it was calculated to mislead the jury; that "it was intended by the court that the jury should understand it as laid down as law, that the Jacksonville, Louisville & St. Louis Railway Co., by virtue of the several conveyances, thereby became liable to the Louisville & Nashville Railway Co."

We do not think the court gave the instruction with the intent the jury should so understand it, or that they did so understand it; on the contrary, nothing in the instruction conveys such meaning; but it is therein clearly stated that to entitle plaintiff to recover *under the contract of April 15, 1888*, certain facts must be first proven. It was intended to inform the jury that plaintiff had a right to recover

under the specific contract set up in said special count of the declaration, provided such proof was made. Evidence was introduced, strongly tending to prove the several facts stated in the instruction; hence it was based on evidence, and the plaintiff was entitled to have it given to the jury as a correct proposition of law, when applied to a certain state of facts. What has been already said will apply to the objections made by appellant to the second instruction given for plaintiff. The plaintiff's sixth instruction is more voluminous than was necessary, but was not calculated to mislead the jury. They must have understood by it, that, if from the evidence they found defendant, in constructing and carrying on its freight and passenger traffic, used the track of plaintiff between Driver's Station and Mt. Vernon, and its depot and terminal facilities there, defendant was liable to pay plaintiff for such use and occupation, the amount they found from the evidence such use and occupation was reasonably worth. This was the law in that state of fact. Under the common counts plaintiff was not bound to prove a special contract in order to recover a reasonable price for the use and occupation of its property.

Plaintiff's seventh instruction could not have prejudiced defendant, but imposed upon plaintiff the burden of proving the assignment to it of the contract of lease, before it would be entitled to recover. This was requiring more of plaintiff than was necessary. If plaintiff and defendant recognized and acted under said contract, as a valid and binding contract between them during the time defendant used and occupied plaintiff's property, no formal assignment of the contract was necessary to a recovery under it by plaintiff for a breach of its conditions. The refusal by the court to give the seventh, eighth, ninth and tenth instructions asked for on behalf of defendant is also assigned as error. The seventh had no proper application to the facts proven and was properly refused. The eighth instruction was calculated to mislead the jury and was not based on the evidence. It was not error to refuse it. The ninth instruction was misleading and superfluous, the jury had full and correct

information given it by the court touching the same matters in the first, second and third instructions given on behalf of plaintiff, and it was not necessary to a fair trial that the same should be repeated. The court did not err in refusing to give defendant's ninth instruction. The tenth refused instruction does not state the law as we understand it, and ought not to have been given. We find no reversible error in giving the instructions on behalf of plaintiff, or refusing to give those which the court refused to give for defendant. The judgment is affirmed.

*Judgment affirmed.*